## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE RECREATIONAL VEHICLE AND SURROUNDING STRUCTURES LOCATED AT 125 VICKERY ROAD, AUBURN, MAINE, 04210 | No. 2:24-mj-00043-KFW <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Alex P. Martin-Wallace, being first duly sworn, depose and state as follows:

### INTRODUCTION AND OFFICER BACKGROUND

1.      I am a Police Officer for the Lewiston Police Department currently assigned to the U.S. Drug Enforcement Administration ("DEA") as a Task Force Officer. I am a graduate of the 31st Basic Law Enforcement Training Program at the Maine Criminal Justice Academy. I have been a Lewiston Police Officer for approximately 7 ½ years and a DEA Task Force Officer for approximately 1 ½ years. During my law enforcement career, I have received training regarding various aspects of drug-related investigations, including the interdiction and identification of different drugs. I also have taken part in multiple drug trafficking investigations involving various types of drugs, including methamphetamine. Over the course of these investigations, I have conducted surveillance, worked with sources, performed interviews, executed search warrants, and processed drug-related evidence. Through my training and experience, I have become familiar with the habits, methods, and procedures commonly employed by individuals engaged in drug trafficking, including their recurrent use of certain premises to engage in drug-related crimes.

2. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize any and all members of law enforcement to search particular premises located at 125 Vickery Road, Auburn, Maine 04210 ("Subject Premises"), which are further described herein and in Attachment A, for the items further described herein and in Attachment B.

3. The facts in this affidavit come from my direct involvement in this investigation, my training and experience, information provided by other members of federal, state, and local law enforcement, information obtained from confidential sources and witnesses, written reports, the results of physical and electronic surveillance, and independent investigation and analysis performed by me and by other law enforcement personnel. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested search warrant.

## STATEMENT OF PROBABLE CAUSE

4. Beginning in January 2024, the DEA undertook an ongoing covert investigation of Jeremy Mercier and others regarding suspected violations of Title 21, United States Code, Sections 841, 843, and 846 (drug trafficking, unlawful use of a communications facility, and conspiracy to commit drug trafficking). Through my direct involvement in this investigation, I have developed probable cause to believe Mercier is trafficking large quantities of methamphetamine in and around Auburn, Maine. As part of this ongoing covert investigation, law enforcement has made two separate controlled purchases of suspected methamphetamine from Mercier at the Subject Premises in February 2024.

5. Based on my direct involvement in this investigation, I know that Mercier is subject to active bail conditions related to a state drug trafficking offense for which he

was charged in 2023. I also know that the paperwork associated with Mercier's state bail conditions lists 125 Vickery Road, Auburn, Maine 04210 as his current residence. Additionally, because I have personally participated in previous bail checks of Mercier, I know that Mercier resides in a dark grey recreational vehicle surrounded by several different permanent, semipermanent, and temporary structures, including sheds, tents, tarps, and similar outdoor shelters, all of which are located at 125 Vickery Road, Auburn, Maine 04210.

6. Based on my direct involvement in this investigation, I know that the Subject Premises is a location that has been used by Mercier to distribute drugs. The Subject Premises consists of a dark grey recreational vehicle that is in the immediate vicinity of several different permanent, semipermanent, and temporary structures, including sheds, tents, tarps, and similar outdoor shelters, all of which are located at 125 Vickery Road, Auburn, Maine 04210. Much of the Subject Premises is not visible from the road as it is set at the end of an extended dirt driveway.

A.  **First Controlled Purchase**

7. On about February 4, 2024, plans were made for a confidential source ("CS")[1] to make a controlled purchase of a quantity of methamphetamine from Mercier at the Subject Premises. Law enforcement met with the CS at a neutral location prior to the controlled purchase. Law enforcement was aware through multiple meetings and phone

---

[1] The CS has been cooperating with law enforcement since January 2024 after being charged in Maine at the state level with unlawful trafficking in scheduled drugs, eluding a police officer, and several motor vehicle violations. In addition to these pending state charges, the CS's criminal history includes convictions for burglary, robbery, theft, and drug trafficking. The CS is cooperating with law enforcement in the hopes of receiving a more favorable sentence with regard to the CS's pending state charges. No promises have been made by law enforcement regarding the sentence the CS will receive. To date, the information that the CS has provided has been corroborated and found to be accurate.

calls with the CS in the preceding days that the CS and Mercier had spoken by telephone on several occasions and made plans to meet at the Subject Premises to complete the drug transaction. Prior to the controlled purchase, the CS's person and vehicle were searched with negative results for contraband. Law enforcement provided the CS with $1,000 in buy money as well as audio and video transmitting and recording devices.

8. While under surveillance by law enforcement, the CS departed the neutral location in the CS's vehicle and drove directly to the Subject Premises. Because the Subject Premises is set at the end of an extended dirt driveway, law enforcement could not see the CS enter the dark grey recreational vehicle from the road, but the audio and video transmitting and recording devices captured Mercier and the CS inside of the recreational vehicle. During a debriefing following the first controlled purchase, the CS reported to law enforcement that while the CS was present at the Subject Premises, Mercier exited the recreational vehicle to obtain a larger vacuum-sealed package of suspected methamphetamine that he had been storing in a snowbank outside of the recreational vehicle. Mercier then opened the larger package inside of the recreational vehicle to weigh and transfer a quantity of suspected methamphetamine, which was packaged in a plastic bag, to the CS in exchange for $1,000. After providing the CS with a quantity of suspected methamphetamine, Mercier took the remaining quantity of suspected methamphetamine—still in the larger vacuum-sealed package—and moved the remaining quantity of suspected methamphetamine to several different spots in his recreational vehicle, apparently attempting to find a suitable hiding place for the package.

9. Following the controlled purchase, the CS departed the Subject Premises in the CS's vehicle and drove directly back to the neutral location, while under surveillance by law enforcement. Upon arrival at the neutral location, the CS gave the suspected

methamphetamine to law enforcement. Law enforcement also retrieved the audio and video transmitting and recording devices and searched the CS's person and the CS's vehicle with negative results for contraband. The suspected methamphetamine from Mercier was initially tested with a TruNarc device. That result was presumptively positive for the presence of methamphetamine. Law enforcement also weighed the suspected methamphetamine and determined it to be approximately 85 grams. Law enforcement then submitted the suspected methamphetamine that Mercier distributed to the CS at the Subject Premises on about February 4, 2024, for laboratory testing at the DEA's New England Laboratory. Results of this laboratory testing have not yet been received.

**B.     Second Controlled Purchase**

10. On about February 8, 2024, plans were made for the CS to make a second controlled purchase of a quantity of methamphetamine from Mercier at the Subject Premises. Law enforcement met with the CS at a neutral location prior to the controlled purchase. The CS reported that before meeting with law enforcement, the CS had made a social visit to Mercier at the Subject Premises, during which the CS arranged with Mercier to meet at the Subject Premises again later that same day to complete the drug transaction. This meeting occurred outside the presence of law enforcement and was not recorded. Prior to the controlled purchase, the CS's person and vehicle were searched with negative results for contraband. Law enforcement provided the CS with audio and video transmitting and recording devices as well as $3,000 in buy money. Also prior to the transaction, law enforcement established surveillance in the area of the Subject Premises.

11. Law enforcement followed as the CS drove to the Subject Premises in the CS's vehicle. Law enforcement could not see the CS enter the dark grey recreational vehicle from the road, but the audio and video transmitting and recording devices

captured Mercier and the CS both outside and inside the recreational vehicle. During a debriefing following the purchase, the CS reported to law enforcement that the CS observed Mercier go into a shed near the recreational vehicle where Mercier appeared to move several objects around. The CS believed that Mercier retrieved the suspected methamphetamine he intended to sell to the CS from the shed near the recreational vehicle. Then, while inside of the recreational vehicle, Mercier sold the CS a quantity of methamphetamine, which was packaged in a plastic bag, for $1,000.

12. Following the controlled purchase, law enforcement maintained surveillance on the CS and the CS's vehicle as the CS departed the Subject Premises in the CS's vehicle and drove directly back to the neutral location. Upon arrival at the neutral location, the CS gave the suspected methamphetamine and remaining buy money to law enforcement. Law enforcement retrieved the audio and video transmitting and recording devices and searched the CS's person and the CS's vehicle with negative results for contraband. The suspected methamphetamine from Mercier was initially tested with a TruNarc device. That result was presumptively positive for the presence of methamphetamine. Law enforcement also weighed the suspected methamphetamine and determined it to be approximately 87 grams. Law enforcement then submitted the suspected methamphetamine that Mercier distributed to the CS at the Subject Premises on about February 8, 2024, for laboratory testing at the DEA's New England Laboratory. Results of this laboratory testing have not yet been received.

### C. Drug Trafficking

13. Based on my training and experience and the training and experience of other law enforcement personnel with whom I have spoken and worked, I know the following:

   a. Drug traffickers often store drugs and drug proceeds in private places, including their residences and other surrounding structures, such as sheds, tents, tarps, and similar outdoor shelters, located in close proximity to them and their residences, that are provided or maintained by them or one or more associates, and drug traffickers often use safes or other locked containers within these relatively secure locations to store drugs, drug proceeds, and other evidence of drug trafficking;

   b. Drug traffickers often possess and store firearms, ammunition, and other dangerous weapons in their residences and other surrounding structures where their drugs and drug proceeds are stored, in order to protect themselves, their supplies of drugs, and their drug proceeds;

   c. Drug traffickers often keep, on hand, large quantities of U.S. currency in order to maintain and finance their drug trafficking activities;

   d. Drug traffickers often keep books, records, receipts, notes, ledgers, and other papers related to ordering, purchasing, transporting, and distributing drugs in private places where drug traffickers have ready access to them, including their residences, other surrounding structures, and other secure locations where drugs and drug proceeds may be stored;

e. Drug traffickers often purchase or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets;

f. Even though these assets may be purchased or titled in someone else's name, drug traffickers actually own and continue to use these assets, and exercise dominion and control over them; and

g. Drug traffickers often use cellular telephones and other digital devices and electronic storage media in furtherance of their criminal activities.

## CONCLUSION

14. I respectfully submit, based on the above-stated facts, that this affidavit sets forth probable cause for a warrant to search the Subject Premises described in Attachment A and to seize the items described in Attachment B.

Alex Martin-Wallace, Task Force Officer
U.S. Drug Enforcement Administration

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Feb 13 2024

City and state: Portland, Maine

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title

8